# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACKWATER LODGE AND TRAINING CENTER, INC., a Delaware corporation dba BLACKWATER WORLDWIDE,<br><br>Plaintiff,<br><br>vs.<br><br>KELLY BROUGHTON, in his capacity as Director of the Development Services Department of the City of San Diego; THE DEVELOPMENT SERVICES DEPARTMENT OF THE CITY OF SAN DIEGO, an agency of the City of San Diego; AFSANEH AHMADI, in her capacity as the Chief Building Official for the City of San Diego; THE CITY OF SAN DIEGO, a municipal entity; and DOES 1-20, inclusive,<br><br>Defendants. | CASE NO. 08-CV-0926 H (WMC)<br><br>**ORDER GRANTING PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

On May 23, 2008, plaintiff Blackwater Lodge and Training Center ("Plaintiff") filed a complaint against the City of San Diego ("City"), the Development Services Department of the City of San Diego and Kelly Broughton, that agency's director, and the City's Chief Building Official (collectively, "Defendants"). (Doc. No. 1.) On May 27, 2008, Plaintiff filed an ex parte application for a temporary restraining order ("TRO") and an order to show cause regarding a preliminary injunction. (Doc. No. 4.) The Court set a hearing on Plaintiff's

application on May 30, 2008. (Doc. No. 6.) On May 29, 2008, Defendants filed a response in opposition to Plaintiff's request for a TRO. (Doc. No. 7.) Plaintiff has filed a reply. (Doc. No. 10.)

On May 30, 2008, the Court held a hearing on Plaintiff's application for a TRO. Michael I. Neil, John Nadolenco and Jeffrey Chine appeared on behalf of Plaintiff. Donald McGrath and Walter C. Chung appeared for Defendants. (See Doc. No. 12.) For the reasons discussed below, the Court grants Plaintiff's application for a TRO.

## Background

Plaintiff has a contract to provide training to members of the United States Navy. (Compl. ¶¶ 1, 16-20; Decl. of Brian Bonfiglio ISO Plf's. Ex Parte App. for TRO ("Bonfiglio Decl.") ¶ 7.) Plaintiff intends to conduct indoor training at a warehouse at 7685 Siempre Viva Road, in the Otay Mesa area of San Diego ("the Otay Mesa facility"). (Bonfiglio Decl. ¶ 8.) The Otay Mesa neighborhood where Plaintiff's facility is located consists of large industrial buildings and lacks residential properties. (Id. ¶ 8, Exs. A, X.) Several vocational facilities, including a certified police academy, are housed near Plaintiff's facility. (Bonfiglio Decl. ¶ 9.)

In developing the Otay Mesa facility, Plaintiff entered into a joint venture with Southwest Law Enforcement Training Enterprises ("Southwest").[1] (Id. ¶ 10.) On September 5, 2007, Southwest filed a general application with the City's Development Services Department for a building permit to construct 44 feet of new partitions at the Otay Mesa facility. (Bonfiglio Decl. ¶ 10; see Decl. of Afsaneh Ahmadi ISO Defs.' Oppo. to Plf's. Ex Parte Request For TRO ("Ahmadi Decl."), Ex. A.) The application, which identified Southwest as the "lessee or tenant" of the property, stated that the existing use was "w[are]house with offices," and that the proposed use was "same (no change)." (Ahmadi Decl., Ex. A.) The City's documents indicate that the project type was "ministerial." (Id.) Southwest's permit application was granted. (Bonfiglio Decl. ¶ 10.)

---

[1] Plaintiff states that subsequently, in "late spring 2008," Plaintiff and Southwest could not reach mutually agreeable terms and parted company. (Bonfiglio Decl. ¶ 14.)

1   On February 7, 2008, another general application was filed with the City's
2 Development Services Department related for a building permit to conduct electrical work
3 at the Otay Mesa facility. (Ahmadi Decl., Ex. B.) The application identified Safchild
4 Investments LLC as the owner of the property and referred to the project title as "South
5 West Police." (Id.) The application sought a permit for work including the installation of
6 two new air conditioning units and six exhaust fans. (Id.) Similar to the previous
7 application for the Otay Mesa facility, the City classified the project type as "ministerial."
8 (Id.) The permit was granted. (See Bonfiglio Decl. ¶ 11.)

9   On February 8, 2008, another general application for a building permit was filed,
10 this time by Raven Development Group, an entity that the application identified as a lessee
11 or tenant of the Otay Mesa facility. (Ahmadi Decl., Ex. C; see Bonfiglio Decl. ¶ 11.)
12 Raven Development Group is a corporate affiliate of Plaintiff and specializes in the
13 development of training facilities. (Bonfiglio Decl. ¶ 11.) This application stated the
14 project description as: "Add indoor firing range." (Ahmadi Decl., Ex. C.) It listed the
15 existing use of the property as "warehouse," and the proposed use as "training facility."
16 (Id.) The City's documents, which again listed the project type as "ministerial," stated the
17 project's scope as "[b]uilding permit to add modular training unit inside of ex[isting]
18 warehouse for ex[isting] Southwest Law Enforcement facility." (Id.) The City granted the
19 permit. (Id., see Bonfiglio Decl. ¶ 11.) Once the permit was granted, Plaintiff states that it,
20 assisted by Raven Development Group, began installing the additional air conditioning
21 units and exhaust fans and constructing the firing range. (Bonfiglio Decl. ¶ 11.)

22   On March 21, 2008, the City's electrical inspector approved the Otay Mesa
23 facility's electrical infrastructure. (Bonfiglio Decl. ¶ 12.) On March 25, 2008, a City fire
24 inspector approved the fire and safety permits. (Id.) Mr. Bonfiglio, who is Plaintiff's Vice
25 President, states that on each occasion he met with the inspector, identified himself as
26 working for Plaintiff, and provided his Blackwater business card. (Id. ¶ 13.)

27   On April 29, 2008, the City's Chief Building Official (defendant Ahmadi) reviewed
28 Plaintiff's plans for the Otay Mesa facility and found no unresolved issues. (Bonfiglio

Decl. ¶¶ 17, 18.) On April 30, 2008, the City's structural engineer conducted a final inspection of the Otay Mesa facility. (Id. ¶ 19.) The structural engineer signed Plaintiff's permits and plans, and the evidence shows that the City on April 30, 2008 approved the certificate of occupancy, since the City's inspection record bears a signature from that date by "Aguirre." (See Bonfiglio Decl., Ex. U.) At the conclusion of the April 30, 2008 final inspection, the City's structural engineer informed Plaintiff that the City's Development Services Department would mail the paper certificate of occupancy within the next few weeks. (Id. ¶ 19, Ex. U.)

On May 19, 2008, the Director of the City's Development Services Department informed Plaintiff that the City will not issue a certificate of occupancy to Plaintiff for the Otay Mesa facility. (Id. ¶ 51.) The letter stated that Plaintiff may continue to use the facility as a warehouse, but not as a shooting range or vocational/trade school until a certificate of occupancy has been issued. (Id. ¶¶ 51-52.) Plaintiff asserts that the issuance of a certificate of occupancy is a non-discretionary duty that Defendants must perform. Plaintiff seeks a temporary restraining order enjoining Defendants from (1) enforcing defendant Broughton's May 19, 2008 letter purportedly refusing to issue a certificate of occupancy, and (2) refusing to issue the certificate of occupancy for the Otay Mesa property.

**Discussion**

**A.     TRO – Legal Standard**

Rule 65 of the Federal Rules of Civil Procedure provides that a "court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

With the exception of the additional requirements imposed by Rule 65 for a TRO

1  issued without notice to the adverse party, the legal standard for issuing a TRO parallels
2  that for a preliminary injunction.  See Fed. R. Civ. P. 65(b).  A plaintiff is entitled to a
3  preliminary injunction when the plaintiff demonstrates a strong likelihood of success on the
4  merits, irreparable harm if injunctive relief is not granted, that the threatened injury to the
5  plaintiff outweighs whatever damage the proposed injunction might cause to the opposing
6  party, and that the issuance of the injunction will not be adverse to the public interest.  See
7  Regents of Univ. of Cal. v. ABC, Inc., 747 F.2d 511, 515 (9th Cir. 1984).  Alternatively, a
8  plaintiff may be entitled to a preliminary injunction by establishing "the existence of
9  serious questions going to the merits and that the balance of hardships tips sharply in his
10 favor."  Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998); see Stuhlbarg Int'l. Sales
11 Co. v. John D. Brush & Co., 240 F.3d 832, 839-4 (9th Cir. 2001).  These alternative
12 formulations "represent two points on a sliding scale in which the required degree of
13 irreparable harm increases as the probability of success decreases."  Roe v. Anderson, 134
14 F.3d at 1402; see Clear Channel Outdoor Inc. v. City of Los Angeles, 340 F.3d 810, 813
15 (9th Cir. 2003).  Thus, if "the balance of harm tips decidedly toward the plaintiff, then the
16 plaintiff need not show as robust a likelihood of success on the merits."  State of Alaska ex
17 rel. Yukon Flats School Dist. v. Native Village of Venetie, 856 F.2d 1384, 1389 (9th Cir.
18 1988).

**B.     Standing and Jurisdiction**

20       As a threshold matter, Defendants dispute whether Plaintiff has standing to bring
21 this action.  (See Doc. No. 7.)  Based on the evidence presently before the Court, the Court
22 concludes that Plaintiff has standing to assert its federal and state law claims against
23 Defendants.  Standing exists when there is (1) a threatened or actual distinct injury to the
24 plaintiff; (2) a fairly traceable causal nexus between the alleged injury and the defendant's
25 challenged conduct; and (3) a substantial likelihood that the requested relief will redress or
26 prevent the injury.  See McMichael v. County of Napa, 709 F.2d 1268, 1270 (9th Cir.
27 1983).  Here, Plaintiff satisfies these requirements.  Plaintiff has submitted sworn testimony
28 that Plaintiff was engaged in a joint venture with Southwest and that Plaintiff currently is

1  affiliated with Raven Development Group.  (See Compl. ¶¶ 26-27, 30; Bonfiglio Decl.
2  ¶¶ 10-11.)  Significantly, the San Diego Municipal Code ("SDMC") defines "permit
3  holder" as "an applicant who has been granted a permit, or the applicant's successor, or the
4  person using the property that is subject to the permit."  SDMC § 113.0103.  It is
5  undisputed that Plaintiff seeks to use the Otay Mesa facility.  (Bonfiglio Decl. ¶¶ 8, 10-11,
6  13.)  It is common for a contractor or developer to seek a permit on behalf of the owner or
7  user of a property.  (See Decl. of William J. Bohac ISO Plf's. Ex Parte App. for TRO ¶ 2.)
8  Here, Plaintiff submitted sworn testimony that Raven Development Group is working with
9  Plaintiff to obtain the applicable permits.  (Id.; see Bonfiglio Decl. ¶¶ 10-11.)

10  The Court concludes that Plaintiff is challenging Defendants' application of
11  municipal land use law to Plaintiff, and the threatened injury of being barred from use of a
12  property in which Plaintiff has an interest.  Defendants present no evidence disputing
13  Plaintiff's relationship with Southwest or Raven Development Group, or the fact that
14  Plaintiff is a tenant, lessee or other occupant of the Otay Mesa facility.  To the contrary, the
15  City's May 19, 2008 letter stating that the City would not send the certificate of occupancy
16  is addressed to Plaintiff.  (Bonfiglio Decl., Ex. I.)  Accordingly, the Court concludes that
17  Plaintiff has standing to contest Defendants' refusal to issue a certificate of occupancy for
18  that property.

19  Additionally, the Court rejects Defendants' contention that Plaintiff must exhaust
20  available state remedies, namely by seeking a writ of mandamus in state court pursuant to
21  California Code of Civil Procedure § 1085, prior to seeking relief in federal court.  The
22  Supreme Court "ha[s] long held" that unless Congress expressly imposes such a
23  requirement, an action under § 1983 is free of the requirement of exhaustion of state
24  judicial or administrative remedies.  Ellis v. Dyson, 421 U.S. 426, 432 (1975).  Here, the
25  Court concludes that Plaintiff has alleged "a continuing, actual controversy, as is mandated
26  by . . . Art[icle] III of the Constitution," see id. at 433, and successfully invoked the Court's
27  subject matter jurisdiction.  (See Compl. ¶¶ 9-11.)
28  ///

**C. Plaintiff's Application Demonstrates That a TRO is Warranted**

After considering the submissions of the parties, the Court concludes that Plaintiff has met its burden to demonstrate a strong likelihood of success on the merits, irreparable harm if injunctive relief is not granted, that the threatened injury to Plaintiff outweighs whatever damage a TRO might cause to Defendants, and that the issuance of the injunction will not be adverse to the public interest.  See Regents of Univ. of Cal. v. ABC, Inc., 747 F.2d at 515.

**1. Likelihood of Success On the Merits**

Plaintiff's request for injunctive relief centers on Plaintiff's claim, based on several legal theories, that it is entitled to the issuance of a certificate of occupancy for the Otay Mesa facility.  The Court concludes that Plaintiff's application demonstrates a strong likelihood of success on the merits of that claim.

The Court concludes that Plaintiff is likely to succeed on the merits of its claim that Defendants have a mandatory duty to issue the certificate of occupancy and that Defendants' failure to do so violated federal and state law.[2]  Defendants contend that no permit application has been filed to allow any change in the use of the Otay Mesa building from anything other than a warehouse.  First, however, Plaintiff appears likely to succeed on its argument that no permit is needed to operate a vocational/trade school within the Otay Mesa development, since such uses are permitted as a matter of right.  The SDMC authorizes "[a]ll uses permitted in the IH-2-1 zone."  See SDMC § 1517.0301(a)(1).[3]  Vocational schools are permitted in the IH-2-1 zone and, therefore, in the Otay Mesa development, which consists of industrial buildings and lacks residential properties.

---

[2] Plaintiff's application for a TRO focuses only on Plaintiff's ability to use the "portions of the building identified for use as a shooting range and vocational/trade school," which was the subject of the May 19, 2008 letter from the director of the City's Developmental Services Department refusing to issue the certificate of occupancy and directing Plaintiff not to use those portions of the building for those uses.  Subsequent to the commencement of this action, Plaintiff filed a permit application relating to a partial replica of a ship bulkhead necessary for the training Plaintiff seeks to provide to Navy sailors.  That permit application, which also appears to be ministerial, remains pending.  (See Bohac Decl. ¶¶ 5-11.)

[3] Plaintiff has provided the Court with an appendix of selected provisions of the San Diego Municipal Code.  (See Doc. No. 5.)

1  SDMC § 131.0622, Table 131-06B; see Bonfiglio Decl. ¶ 8, Exs. A, X.  The SDMC
2  exempts facilities permitted in the IH-2-1 zone from obtaining special permits, and
3  provides that permits for such facilities are subject to ministerial review, not the
4  discretionary review process that requires an applicant to seek approval by the City
5  Council.  See SDMC § 53.10(d).  Prior to May 19, 2008, all required permits and approvals
6  were considered by the City to be ministerial, and were granted without any indication that
7  Plaintiff's project required discretionary review or that City officials could refuse to
8  provide Plaintiff with the certificate of occupancy at issue.  SDMC § 1517.0301; see
9  Bonfiglio Decl. ¶¶ 12, 18-19.  At the May 30, 2008 hearing, Plaintiff played an audio
10 recording of a statement by Jerry Sanders, Mayor of the City of San Diego, explaining that
11 "the original decision was ministerial" and that the Mayor believed that Plaintiff's project
12 "was properly permitted."  (Doc. No. 13; see Tr. (Doc. No. 15) at 4:9-10, 5:1-2.)  Plaintiff
13 also provided evidence of other vocational facilities in the Otay Mesa area, as well as other
14 firing ranges within the City, and sworn testimony that according to City employees there
15 were no records of any discretionary permits for such properties.  (See Bonfiglio Decl.
16 ¶ 30.)

17         Second, even if a permit was required for a change of use to a vocational/trade
18 school, the evidence indicates that such a permit was filed and granted.  The general
19 application filed February 8, 2008, states the existing use as "warehouse" and the proposed
20 use as "training facility."  (Ahmadi Decl., Ex. C.)  That application also listed the project
21 description as "[a]dd indoor firing range," and the attached hazardous material
22 questionnaire identified the "business activities" of the facility as "Training Facility for
23 Law Enforcement."  (Id.)  The City granted that application.  (Id.; Bonfiglio Decl. ¶ 11.)
24 Moreover, the application filed several months earlier, in September of 2007, which the
25 City also granted, had indicated that the partition revision was related to the "storage of
26 ammo."  (Ahmadi Decl., Ex. A.)  One of the applications filed in February of 2008 stated
27 the project's scope as  "[b]uilding permit to add modular training unit inside of ex[isting]
28 warehouse for ex[isting] Southwest Law Enforcement facility."  (Ahmadi Decl., Ex. C.)  In

light of these applications, the Court is not persuaded by Defendants' arguments that the nature of Plaintiff's project only recently became known.

On April 30, 2008, a City structural engineer inspected the facility, signed Plaintiff's permits and plans, and informed Plaintiff that the City's Development Services department would mail to Plaintiff the certificate of occupancy within a short period of time. (See Bonfiglio Decl. ¶ 19, Ex. U.) Also on April 30, 2008, a city official signed the "certificate of occupancy" portion of the inspection record. (Id.) Nothing remains but for Defendants to issue the certificate of occupancy, and the SDMC provides no discretion for Defendants to refuse to do so: "The Building Official shall inspect the structure and if the Building Official finds no violations of the Land Development Code or other regulations that are enforced by the City's designated Code Enforcement Official, the Building Official shall issue a certificate of occupancy." SDMC § 129.0114; see also Inland Empire Health Plan v. Superior Court, 108 Cal. App. 4th 588, 593 (2003) ("a city has a mandatory duty to issue a certificate of occupancy once it has found that a construction project has complied with all requirements"); Thompson v. City of Lake Elsinore, 18 Cal. App. 4th 49, 58 (1993) ("Once the building permit has been issued, it cannot be de facto revoked by the simple expedient of never issuing the certificate of occupancy.").

The Court also concludes that Plaintiff's application demonstrates a strong likelihood of success on its procedural due process claim brought pursuant to 42 U.S.C. § 1983. "A property interest in a benefit protected by the due process clause results from a legitimate claim of entitlement created and defined by an independent source, such as state or federal law." Parks v. Watson, 716 F.2d 646, 656 (9th Cir. 1983). Here, Plaintiff argues that state and local law providing that Defendants "shall" issue the certificate of occupancy creates a protectable property interest, because when a governmental agency is given little to no discretion regarding whether to grant a permit, the denial of that permit creates a protectable right. See id. Accordingly, Plaintiff argues that Defendants violated the Constitution by depriving Plaintiff of that protectable right without "notice and opportunity for hearing appropriate to the nature of the case." See Cleveland Bd. of Educ. v.

1 Loudermill, 470 U.S. 532, 542 (1985).  The Court concludes that Plaintiff's application
2 demonstrates a strong likelihood of success on this claim.  Plaintiff's evidence shows that
3 Plaintiff obtained all necessary building permits and approvals for a certificate of
4 occupancy, that on April 30, 2008, the certificate of occupancy was approved (see
5 Bonfiglio Decl., Ex. U), but that Defendants without notice to Plaintiff have refused to
6 actually issue the certificate of occupancy.  See Parks, 716 F.2d at 657 ("[o]nce the
7 conditions are met the city lacks discretionary powers").

8       In sum, the Court concludes that Plaintiff has demonstrated a strong likelihood of
9 success on the merits of its claim that Defendants have a mandatory duty to issue the
10 certificate of occupancy.

11       **2.**     **Plaintiff Faces Irreparable Harm In the Absence of a TRO**

12       The Court concludes that Plaintiff's application demonstrates that Plaintiff faces a
13 significant threat of immediate and irreparable injury in the absence of interim injunctive
14 relief.  See Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999).  First, Plaintiff
15 has demonstrated a strong likelihood of success on its constitutional claims, see supra, a
16 situation in which most courts do not require a further showing of irreparable injury.  See
17 Elrod v. Burns, 427 U.S. 347, 373 (1976).  Additionally, Plaintiff's application
18 demonstrates that Plaintiff has an urgent need to receive the certificate of occupancy,
19 without which Plaintiff is prevented from utilizing the Otay Mesa property as Plaintiff
20 intends.  In the absence of interim injunctive relief, Plaintiff faces the threat of being unable
21 to fulfill an important training contract with the United States Navy.  (Bonfiglio Decl. ¶
22 31.)  Plaintiff has presented evidence that its obligations under the contract commence on
23 June 2, 2008, the date of the hearing on Plaintiff's application for a TRO.  The Court
24 concludes that Plaintiff's application satisfies Plaintiff's burden to establish that without
25 injunctive relief Plaintiff faces an immediate threat of irreparable injury.
26 ///
27 ///
28 ///

### 3. Balance of Hardships

Third, the Court concludes that the threatened injury to Plaintiff outweighs whatever damage the proposed TRO might cause to Defendants. See Regents of Univ. of Cal. v. ABC, Inc., 747 F.2d at 515. The potential harm to Plaintiff if injunctive relief is denied is significant, while granting Plaintiff's application for a TRO will result in little to no damage or hardship to Defendants. The Court concludes that the balance of hardships tips sharply in Plaintiff's favor, so that even if Plaintiff's application demonstrated only "serious questions going to the merits," Plaintiff still would be entitled to a TRO under the Ninth Circuit's alternative standard for interim injunctive relief. Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998); see Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839-40 (9th Cir. 2001).

### 4. Consideration of the Public Interest

Finally, the Court concludes that granting Plaintiff's application for a TRO will not adversely affect the public interest. Id. To the contrary, given the nature of the intended use of the Otay Mesa facility and Plaintiff's training contract with the United States Navy, the Court concludes that the public interest weighs in favor of granting injunctive relief.

### Conclusion

For the reasons discussed above, the Court grants Plaintiff's application for a TRO. Defendants are hereby enjoined from refusing to perform the ministerial task of sending Plaintiff a certificate of occupancy for the property located at 7685 Siempre Viva Road, Otay Mesa and/or refusing to allow Plaintiff to occupy and use immediately that property consistent with the permits that the City already has granted. The Court also orders Defendants to promptly and properly process any currently pending ministerial permits for the Otay Mesa property. Under the circumstances of this case, the Court concludes that Plaintiff must give security in the amount of $10,000. See Fed. R. Civ. P. 65(c).

The Court orders Defendants to show cause why a preliminary injunction should not issue. The Court will hold a hearing on June 17, 2008 at 10:30 a.m. regarding a preliminary injunction. No later than June 9, 2008, Defendants shall file a response in

1  opposition to the issuance of a preliminary injunction.  Plaintiff shall file a reply on or
2  before June 12, 2008.
3  IT IS SO ORDERED.
4  DATED: June 4, 2008

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

COPIES TO:
All parties of record.