1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACKWATER LODGE AND TRAINING CENTER, INC., a Delaware corporation dba BLACKWATER WORLDWIDE,<br><br>                                        Plaintiff,<br><br>        vs.<br><br>KELLY BROUGHTON, in his capacity as Director of the Development Services Department of the City of San Diego; THE DEVELOPMENT SERVICES DEPARTMENT OF THE CITY OF SAN DIEGO, an agency of the City of San Diego; AFSANEH AHMADI, in her capacity as the Chief Building Official for the City of San Diego; THE CITY OF SAN DIEGO, a municipal entity; and DOES 1-20, inclusive,<br><br>                                        Defendants. | CASE NO. 08-CV-0926 H (WMC)<br><br>**ORDER GRANTING PRELIMINARY INJUNCTION** |

On May 23, 2008, plaintiff Blackwater Lodge and Training Center ("Plaintiff") filed a complaint against the City of San Diego ("City"), the Development Services Department of the City of San Diego and Kelly Broughton, that agency's director, and the City's Chief Building Official (collectively, "Defendants"). (Doc. No. 1.) On May 27, 2008, Plaintiff filed an ex parte application for a temporary restraining order ("TRO") and an order to show cause regarding a preliminary injunction.  (Doc. No. 4.)  On June 4, 2008, the Court granted

1    Plaintiff's application for a TRO and ordered Defendants to show cause why a preliminary

2    injunction should not issue.  (Doc. Nos. 16, 17.)

3         On June 9, 2008, Defendants filed a response in opposition to the issuance of a

4    preliminary injunction.  (Doc. No. 21.)  Defendants also filed a request for judicial notice.

5    (Doc. No. 21-2.)  The Court grants that request with respect to decisions by California courts

6    and provisions of the San Diego Municipal Code.  See Fed. R.  Evid. 201.  Plaintiff filed a

7    reply on June 12, 2008.  (Doc. Nos. 24, 26, 27.)  Plaintiff also filed objections to evidence

8    submitted by Defendants in support of Defendants' response in opposition.  (Doc. No. 28.)

9         On June 17, 2008, the Court held a hearing on its order to show cause regarding a

10    preliminary injunction.  Michael I. Neil, John Nadolenco and Jeffrey Chine appeared for

11    Plaintiff.  Defendants were represented by Michael J. Aguirre, Carmen A. Brock, George F.

12    Schaefer, Robert J. Walters and Maria Severson.  For the reasons discussed below, the Court

13    grants a preliminary injunction.

14                                   **Background**

15         Plaintiff has a contract to provide training to members of the United States Navy.

16    (Compl. ¶¶ 1, 16-20; Decl. of Brian Bonfiglio ISO Plf's. Ex Parte App. for TRO

17    ("Bonfiglio Decl.") ¶ 7.)  Plaintiff intends to conduct indoor training at a warehouse at

18    7685 Siempre Viva Road, in the Otay Mesa area of San Diego ("the Otay Mesa facility").

19    (Bonfiglio Decl. ¶ 8.)  The Otay Mesa neighborhood where Plaintiff's facility is located

20    consists of large industrial buildings and lacks residential properties.  (Id. ¶ 8, Exs. A, X.)

21    Several vocational facilities, including a certified police academy, are housed near

22    Plaintiff's facility.  (Bonfiglio Decl. ¶ 9.)

23         The City Grants a Series of Ministerial Permit Applications

24         In developing the Otay Mesa facility, Plaintiff entered into a joint venture with

25    Southwest Law Enforcement Training Enterprises ("Southwest").[1]  (Id. ¶ 10.)  On

26    September 5, 2007, Noble Construction Consultants, a contractor for Plaintiff, filed a

27

28         [1]    Plaintiff states that subsequently, in "late spring 2008," Plaintiff and Southwest could
not reach mutually agreeable terms and parted company.  (Bonfiglio Decl. ¶ 14.)

08cv926

general application with the City's Development Services Department for a building permit to construct 44 feet of new partitions at the Otay Mesa facility.  (See Audit Report at 6; Bonfiglio Decl. ¶ 10; Decl. of Afsaneh Ahmadi ISO Defs.' Oppo. to Plf's. Ex Parte Request For TRO ("Ahmadi Decl."), Ex. A.)  The application, which identified Southwest as the "lessee or tenant" of the property, stated that the existing use was "w[are]house with offices," and that the proposed use was "same (no change)."  (Ahmadi Decl., Ex. A.)  The City's documents indicate that the project type was "ministerial."  (Id.)  The City granted that permit application.  (Bonfiglio Decl. ¶ 10.)

On October 1, 2007, Plaintiff's contractor Noble Construction Consultants filed another building permit application.  (Audit Report at 6.)  This application identified the project description as "install air conditioning and exhaust," and the proposed use for the facility as "training."  (Audit Report at 6.)

On February 7, 2008, another general application was filed with the City's Development Services Department for a building permit to conduct electrical work at the Otay Mesa facility.  (Ahmadi Decl., Ex. B.)  The application identified Safchild Investments LLC as the owner of the property and referred to the project title as "South West Police."  (Id.)  The application sought a permit for work including the installation of two new air conditioning units and six exhaust fans.  (Id.)  Similar to the previous application for the Otay Mesa facility, the City classified the project type as "ministerial." (Id.)  The permit was granted.  (See Bonfiglio Decl. ¶ 11.)

On February 8, 2008, another general application for a building permit was filed, this time by Raven Development Group, an entity that the application identified as a lessee or tenant of the Otay Mesa facility.  (Ahmadi Decl., Ex. C; see Bonfiglio Decl. ¶ 11.) Raven Development Group is a corporate affiliate of Plaintiff and specializes in the development of training facilities.  (Bonfiglio Decl. ¶ 11.)  This application stated the project description as: "Add indoor firing range."  (Ahmadi Decl., Ex. C.)  It listed the existing use of the property as "warehouse," and the proposed use as "training facility." (Id.)  The City's documents, which again listed the project type as "ministerial," stated the

08cv926

1    project's scope as "[b]uilding permit to add modular training unit inside of ex[isting]
2    warehouse for ex[isting] Southwest Law Enforcement facility." (<u>Id.</u>)  The City granted the
3    permit.  (<u>Id.</u>, <u>see</u> Bonfiglio Decl. ¶ 11.)  Once the permit was granted, Plaintiff states that it,
4    assisted by Raven Development Group, began installing the additional air conditioning
5    units and exhaust fans and constructing the firing range.  (Bonfiglio Decl. ¶ 11.)

6         On March 21, 2008, the City's electrical inspector approved the Otay Mesa
7    facility's electrical infrastructure.  (Bonfiglio Decl. ¶ 12.)  On March 25, 2008, a City fire
8    inspector approved the fire and safety permits.  (<u>Id.</u>)  Mr. Bonfiglio, who is Plaintiff's Vice
9    President, states that on each occasion he met with the inspector, identified himself as
10   working for Plaintiff, and provided his Blackwater business card.  (<u>Id.</u> ¶ 13.)

11        On April 29, 2008, the City's Chief Building Official (defendant Ahmadi) reviewed
12   Plaintiff's plans for the Otay Mesa facility and found no unresolved issues.  (Bonfiglio
13   Decl. ¶¶ 17, 18.)  On April 30, 2008, the City's structural engineer conducted a final
14   inspection of the Otay Mesa facility.  (<u>Id.</u> ¶ 19.)  The structural engineer signed Plaintiff's
15   permits and plans, and the evidence shows that the City on April 30, 2008 approved the
16   certificate of occupancy, since the "certificate of occupancy" line on the City's inspection
17   record bears a signature from that date by "Aguirre."  (<u>See</u> Bonfiglio Decl., Ex. U.)  At the
18   conclusion of the April 30, 2008 final inspection, the City's structural engineer informed
19   Plaintiff that the City's Development Services Department would mail the paper certificate
20   of occupancy within the next few weeks.  (<u>Id.</u> ¶ 19, Ex. U.)

21        <u>The City Reverses Course and Refuses to Issue a Certificate of Occupancy</u>
22        On May 19, 2008, the Director of the City's Development Services Department
23   informed Plaintiff that the City would not issue a certificate of occupancy to Plaintiff for
24   the Otay Mesa facility.  (<u>Id.</u> ¶ 51.)  The letter stated that Plaintiff may continue to use the
25   facility as a warehouse, but not as a shooting range or vocational/trade school until a
26   certificate of occupancy has been issued.  (<u>Id.</u> ¶¶ 51-52.)  Plaintiff sought a TRO enjoining
27   Defendants from refusing to issue a certificate of occupancy for the Otay Mesa facility
28   consistent with the permits the City already had granted.  At the May 30, 2008 hearing

regarding Plaintiff's application for a TRO, Defendants contended that new and/or additional "discretionary" review was proper because throughout the permit process Plaintiff had concealed its identity from the City, as well as misrepresented the true nature of the intended use of the Otay Mesa facility.  (Tr. (Doc. No. 15) at 26:4-28:2.)

<u>The Court Grants Plaintiff's Application For a TRO</u>

On June 4, 2008, the Court granted Plaintiff's application for a TRO.  (Doc. Nos. 16, 17.)  The TRO enjoined Defendants from refusing to perform the ministerial task of issuing a certificate of occupancy for the Otay Mesa property and/or refusing to allow Plaintiff to occupy and use immediately that property consistent with the permits that the City already has granted.  (<u>Id.</u>)  Additionally, the Court ordered Defendants to promptly and properly process any currently pending ministerial permits for the Otay Mesa property.  (<u>Id.</u>)  On June 6, 2008, Defendants submitted notice of compliance with the TRO.  (Doc. No. 20.) According to the Deputy Director of the City's Building Construction and Safety Division of the Development Services Department and the City's Chief Building Official, the City on June 5, 2008 issued (1) a certificate of occupancy for the firing range consistent with City Building Permit/Approval No. 529104 and (2) a certificate of occupancy for use of other portions of the building consistent with City Building Permit/Approval No. 483606. (Decl. of Afsaneh Ahmadi ISO Cert. of Compliance ¶¶ 2-3.)  Plaintiff states that since that time it has welcomed its first class of United States Navy sailors to the facility.  (Plf's. Reply at 3.)

<u>The City Auditor's Report</u>

On May 5, 2008, prior to the time that the City declared its refusal to issue a certificate of occupancy for the Otay Mesa facility, the Mayor of the City of San Diego ordered an investigation of Plaintiff's permit applications and desire to use the Otay Mesa facility for Navy training.  (<u>See</u> Supp. Decl. of Brian Bonfiglio ISO Prelim. Inj. ("Supp. Bonfiglio Decl.") ¶ 3.)  As part of this investigation, Plaintiff agreed to provide access to the Otay Mesa facility to the City Auditor and his staff, as well as to answer all questions and provide all documents requested by the City Auditor.  (<u>Id.</u>)  On June 5, 2008, the day

1    after the Court granted Plaintiff's application for a TRO, the City Auditor issued a

2    document entitled "Audit of Permits Issued for the Blackwater Facility" (hereinafter "the

3    Audit Report").  (Supp. Bonfiglio Decl. ¶ 2, Ex. 1.)

4            The stated objectives of the audit "were to answer the following questions:

5            •       Did Blackwater misrepresent its identity or intended use of the facility

6                    located at 7685 Siempre Viva Road, Otay Mesa Development District?

7            •       Did Development Services' staff properly issue permits in compliance with

8                    codes and regulations for the Blackwater facility?

9            •       Is the designation of Vocational/Trade School appropriate for the Otay Mesa

10                   site?"

11   (Supp. Bonfiglio Decl., Ex. 1 at 7.)

12           After reviewing "the building permit and business tax certificate applications that

13   were filed for the Blackwater facility," the City Auditor "determined that Blackwater did

14   not misrepresent [its] identity."  (Audit Report at 5.)  "In the City of San Diego, building

15   permit applications do not require the name of the business owner."  (Id.)  "The Municipal

16   Code Section 112.0102 permits either an owner, an agent of the owner, or a party with a

17   legal interest to be named on the permit application."  (Id.)  In accordance with these

18   provisions of the SDMC, "Blackwater did not complete, sign, or file any of the building

19   permit applications, nor w[as it] required to do so."  (Id.)  The City Audit noted that two of

20   the permit applications for the Otay Mesa facility indicated that the proposed use was for

21   "Training."  (Id.)  Additionally, Plaintiff's business tax certificate application, dated

22   February 6, 2008, "indicated its primary business activity at the facility would be security

23   training for the U.S. Navy."  (Id. at 5-6.)  The Audit report concluded that this constituted

24   "direct evidence that Blackwater represented to the City [its] intent to operate a training

25   facility at the address."  (Id. at 6.)  Accordingly, the audit concluded that Plaintiff did not

26   misrepresent its identity or the intended use of the Otay Mesa facility.

27           Next, the audit addressed whether DSD staff properly issued permits for the Otay

28   Mesa facility.  (Audit Report at 8.)  After reviewing "the Municipal Code, the City

1    Attorney's opinion, and interview[ing] DSD staff, as well as Blackwater officials," the

2    City's Audit Report "determined that DSD staff had the authority under Municipal Code

3    Section 111.0205 to classify Blackwater's use of the building as a vocational/trade school."

4    (Id.)  First, SDMC section "111.0205 states that the City, without a public hearing, is

5    authorized to make a determination of the proper usage."  (Id.)  Further, SDMC "section

6    131.0620(e) states that for any use that cannot be readily classified, the City Manager shall

7    determine the appropriate use category and use subcategory upon request of the applicant

8    or property owner."  (Id.(emphasis in original).)  Based on these provisions of the

9    municipal code, the Audit Report reached two conclusions: (1) "DSD has the authority to

10   classify the use of the facility as a vocational/trade school," and (2) "[v]ocational/trade

11   school, a permitted use, may be approved or denied by staff in accordance with a process

12   one [ministerial] review."  (Id.)  The Audit Report noted that, consistent with these

13   provisions, DSD had "classified the American Shooting Center, another shooting range

14   located in the City, as a vocational/trade school."  (Id.)

15        The SDMC provides that instruction at the vocational/trade schools must be "related

16   to a use permitted in the Otay Mesa Development District."  SDMC §§ 129.0102,

17   129.0107.  Although "the Municipal Code does not state if the subject taught should be

18   directly or indirectly related to a permitted use," Plaintiff's project at issue here "proposes

19   security, law enforcement and/or military training."  (Audit Report at 9.)  According to

20   DSD, security guard use would be classified as a "business support use," which is expressly

21   permitted in the Otay Mesa Development District pursuant to SDMC 1517.0301(a)(7).

22   (Audit Report at 9.)  "There are many examples of security guards at other properties in

23   Otay Mesa that have the same zoning designation."  (Id.)  Additionally, "[l]aw enforcement

24   and military uses are classified within the government office use category," which uses "are

25   permitted in the OMDD by SDMC 1517.0301(a)(1)."  (Id.)  The Audit Report noted the

26   City Attorney's stated belief that a shooting range or law enforcement/security training

27   operation did not "clearly" fall within any of the permitted uses of the IH-2-1 zone in which

28   Plaintiff's Otay Mesa facility is located.  (Audit Report at 10.)  The Audit Report

concluded that "[t]he complexity and lack of clarity for certain sections of the Municipal Code contribute to these differing interpretations." (Id.)  With respect to use of the Otay Mesa facility as a shooting range, the audit concluded that shooting galleries or target ranges are regulated by the San Diego Police Department and do not fall within the Development Services Department's authority over zoning use and building regulations. (Id. at 11.)  The San Diego Police Department "confirmed that a police permit was not required for Blackwater to operate as a firing range." (Id.)

## Discussion

Plaintiff argues that it has complied with all relevant requirements for several permits related to the Otay Mesa facility, that City officials approved Plaintiff's applications, and therefore that Defendants have a non-discretionary duty to issue certificates of occupancy in accordance with those successful permit applications.  The City's Audit Report supports Plaintiff's arguments.  (See Audit Report at 5, 8.)  Although other City officials, including the Mayor, appear to agree, the City Attorney contends that the City may subject Plaintiff's project "to further land use discretionary review."  The Court concludes that Plaintiff has demonstrated a strong likelihood of success on the merits of its claims.  The Court also concludes that Plaintiff has demonstrated the appropriate grounds for preliminary injunctive relief.

**A.      Preliminary Injunction – Legal Standard**

A plaintiff is entitled to a preliminary injunction when the plaintiff demonstrates a strong likelihood of success on the merits, irreparable harm if injunctive relief is not granted, that the threatened injury to the plaintiff outweighs whatever damage the proposed injunction might cause to the opposing party, and that the issuance of the injunction will not be adverse to the public interest.  See Regents of Univ. of Cal. v. ABC, Inc., 747 F.2d 511, 515 (9th Cir. 1984).  Alternatively, a plaintiff may be entitled to a preliminary injunction by establishing "the existence of serious questions going to the merits and that the balance of hardships tips sharply in his favor."  Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998); see Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839-

1   41 (9th Cir. 2001).  These alternative formulations "represent two points on a sliding scale

2   in which the required degree of irreparable harm increases as the probability of success

3   decreases."  Roe v. Anderson, 134 F.3d at 1402; see Clear Channel Outdoor Inc. v. City of

4   Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003).  Thus, if "the balance of harm tips

5   decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of

6   success on the merits."  State of Alaska ex rel. Yukon Flats School Dist. v. Native Village

7   of Venetie, 856 F.2d 1384, 1389 (9th Cir. 1988).

8   **B.      Plaintiff Has Met Its Burden for Issuance of a Preliminary Injunction**

9          After considering the submissions of the parties, the Court concludes that Plaintiff

10  has met its burden to demonstrate a strong likelihood of success on the merits, irreparable

11  harm if injunctive relief is not granted, that the threatened injury to Plaintiff outweighs

12  whatever damage a preliminary injunction might cause to Defendants, and that the issuance

13  of the injunction will not be adverse to the public interest.  See Regents of Univ. of Cal. v.

14  ABC, Inc., 747 F.2d at 515.

15         **1.      Likelihood of Success On the Merits**

16         Plaintiff's request for injunctive relief centers on Plaintiff's claim that, after

17  following all applicable rules for the issuance of its permits and passing all required

18  inspections, the City has a duty to issue the certificate(s) of occupancy consistent with

19  those permits and its own municipal code.  See SDMC § 129.0114.  Over the past several

20  weeks, Defendants have put forth numerous, often changing, purported justifications for the

21  decision to refuse to issue a certificate of occupancy for the Otay Mesa facility.  Defendants

22  decried the fact that Plaintiff's affiliates and contractors had applied for the permits at

23  issue.  (Defs.' Oppo. to Plf's. Ex Parte Request for TRO at 5; see Tr. (Doc. No. 15) at

24  26:15-18.)  The City's own audit later concluded that Plaintiff and its contractors complied

25  with the municipal code and that Plaintiff did not misrepresent its identity or the intended

26  use of the Otay Mesa facility.  (Audit Report at 7.)  Alternatively, Defendants argued,

27  Plaintiff's permits were improper because vocational facilities with target ranges were not

28  allowed without discretionary review by the City Council and CEQA review.  (See Supp.

Bonfiglio Decl., Ex. 1 at 27.)  Once again, the City's own audit contradicts that assertion, which is not supported by the SDMC.  Although SDMC § 53.10 provides, "It is the purpose and intent of the Council of the City of San Diego that firing of firearms . . . within the city limits be strictly regulated," SDMC § 53.10(d) specifically provides exceptions for shooting galleries or target ranges.  (See Audit Report at 10-11.)  Defendant's argument regarding the presence of a firing range is also undermined by the City's past practice with respect to other firing ranges in the City, since Defendant cannot cite a single example of a firing range being subjected to discretionary review.  (See Tr. (Doc. No. 15) at 30:2-16.)

The Court concludes that none of Defendants' arguments change the facts that form the basis of Plaintiff's complaint and request for injunctive relief: Plaintiff properly filed several permit applications, which the City granted after conducting all required inspections under the ministerial process provided by the City's own laws.  (See Bonfiglio Decl. ¶¶ 12, 18-19; Ahmadi Decl., Exs. A, C.)  A City structural engineer conducted a final inspection of Plaintiff's facility, signed Plaintiff's permits and plans, and informed Plaintiff that Development Services Department would mail to Plaintiff the certificate of occupancy within a short period of time.  (Bonfiglio Decl. ¶ 19, Ex. U.)  That same day, April 30, 2008, a city official signed the "certificate of occupancy" portion of the inspection record. (Id. (signature of "Aguirre").)  Despite the SDMC's clear provision stating that if all requirements are met the City "shall issue a certificate of occupancy," see SDMC § 129.0114, the City subsequently refused to actually send Plaintiff the certificate.  Plaintiff contends that Defendants have a ministerial duty under the law to issue the certificate, and the Court concludes that Plaintiff has demonstrated a strong likelihood of success on the merits of that claim.

First, Plaintiff appears likely to succeed on its argument that no conditional use permit is needed to operate a vocational/trade school within the Otay Mesa development, since such uses are permitted as a matter of right.  The SDMC authorizes "[a]ll uses permitted in the IH-2-1 zone."  See SDMC § 1517.0301(a)(1).  Vocational schools are permitted in the IH-2-1 zone and, therefore, in the Otay Mesa development, which consists

of industrial buildings and lacks residential properties.  SDMC § 131.0622, Table 131-06B;
see Bonfiglio Decl. ¶ 8, Exs. A, X.  The SDMC exempts facilities permitted in the IH-2-1
zone from obtaining special permits, and provides that permits for such facilities are subject
to ministerial review, not the discretionary review process that requires an applicant to seek
approval by the City Council.  See SDMC § 53.10(d).  The fact that the vocational school
involves a firing range does not change that conclusion, since the SDMC expressly exempts
target ranges from discretionary Council approval, see Audit Report at 10-11, and assigns
to the San Diego Police Department the authority to require permits for a firing range
(which the SDPD has stated are not necessary for Plaintiff's facility).  (See Audit Report at
11.)

Consistent with these provisions of the SDMC regarding vocational schools and/or
firing ranges, all required permits and approvals for Plaintiff's property were considered by
the City to be ministerial.  As such, they were granted without any indication that the
project required (or that the City had any authority to impose) discretionary review.  See
SDMC § 1517.0301.  Prior to the May 30, 2008 hearing regarding a TRO, Jerry Sanders,
Mayor of the City of San Diego, stated publicly that "the original decision was ministerial"
and that the Mayor believed that Plaintiff's project "was properly permitted."  (Doc. No.
13; see Tr. (Doc. No. 15) at 4:9-10, 5:1-2.)  Defendants' complaints that Plaintiff's
intended use does not qualify as a "vocational" school also ring hollow, in light of the
evidence indicating that Development Services staff (not Plaintiff) classified the building as
a vocational facility.  (See Audit Report at 8.)  Moreover, the evidence indicates that there
are other vocational facilities in the Otay Mesa area, as well as other firing ranges within
the City, none of which have ever been subjected to "discretionary" review by Defendants.
(See Bonfiglio Decl. ¶ 30; Audit Report at 8.)

Second, even if a permit was required for a change of use to a vocational/trade
school, the evidence indicates that multiple such permits were filed and granted.  The
general application filed February 8, 2008, states the existing use as "warehouse" and the
proposed use as "training facility."  (Ahmadi Decl., Ex. C.)  That application also listed the

project description as "[a]dd indoor firing range," and the attached hazardous material questionnaire identified the "business activities" of the facility as "Training Facility for Law Enforcement."  (Id.)  The City granted that application.  (Id.; Bonfiglio Decl. ¶ 11.)  Moreover, the application filed several months earlier, in September of 2007, which the City also granted, had indicated that the partition revision was related to the "storage of ammo."  (Ahmadi Decl., Ex. A.)  One of the applications filed in February of 2008 stated the project's scope as  "[b]uilding permit to add modular training unit inside of ex[isting] warehouse for ex[isting] Southwest Law Enforcement facility."  (Ahmadi Decl., Ex. C.)

Additionally, a business tax application, filed on February 6, 2008 (more than two months before the City raised concerns about Plaintiff's use of the Otay Mesa facility) was filed by "Blackwater Lodge & Training Center, Inc."  (Audit Report at 7.)  The application listed Blackwater's business address as 7685 Siempre Viva (the location of the facility at issue here) and stated: "Blackwater will conduct security training for the United States Navy."  (Id.)  Additionally, the application stated, "Blackwater has contracted with the United States Navy to conduct a course called 'Ship Reactionary Force Basic.'"  (Id.)  In light of these applications, the Court is not persuaded by Defendants' arguments that Plaintiff's identity and/or the nature of Plaintiff's project only recently became known.  (See Audit Report at 6-7.)

On April 30, 2008, a City structural engineer inspected the facility, signed Plaintiff's permits and plans, and informed Plaintiff that the City's Development Services Department would mail to Plaintiff the certificate of occupancy within a short period of time.  (See Bonfiglio Decl. ¶ 19, Ex. U.)  Also on April 30, 2008, a city official signed the "certificate of occupancy" portion of the  inspection record.  (Id.)  Nothing remains but for Defendants to issue the certificate of occupancy, and the SDMC provides no discretion for Defendants to refuse to do so: "The Building Official shall inspect the structure and if the Building Official finds no violations of the Land Development Code or other regulations that are enforced by the City's designated Code Enforcement Official, the Building Official shall issue a certificate of occupancy."  SDMC § 129.0114.

1    Defendants repeatedly stress that "[t]he issuance of building permits . . . is a

2  discretionary function," <u>see</u> <u>Thompson v. City of Lake Elsinore</u>, 18 Cal. App. 4th 49, 57

3  (1993), but the present case does not involve a municipality's discretionary decision to

4  grant or deny a permit application.  A building official is authorized to determine "whether

5  or not a particular project satisfies all the conditions of its building permit, as well as

6  applicable code and other requirements, before issuing the certificate of occupancy."

7  <u>Thompson v. City of Lake Elsinore</u>, 18 Cal. App. 4th at 57.  "[T]he building official must

8  be allowed great latitude (i.e., discretion) in making this determination."  <u>Id.</u>  However, the

9  difference in this case is that the evidence shows City officials have already made that

10  determination, have granted the permits at issue and, after conducting the final inspection,

11  have approved the issuance of certificates of occupancy consistent with those permits.  (<u>See</u>

12  Bonfiglio Decl., Ex. U.)  Once that occurs, pursuant to the City's own municipal code there

13  is little to no discretion regarding whether to issue the certificates.  SDMC § 129.0114.

14    California law supports the conclusion that under these circumstances issuing the

15  certificate of occupancy is a non-discretionary duty that Defendants must perform.  "[T]he

16  discretion to issue a building permit at all is much broader than the discretion which must

17  be exercised in determining whether to issue a certificate of occupancy.  Once the building

18  permit <u>has been issued</u>, it cannot be de facto revoked by the simple expedient of never

19  issuing the certificate of occupancy."  <u>Thompson v. City of Lake Elsinore</u>, 18 Cal. App. 4th

20  at 57-58; <u>see</u> <u>also</u> <u>Inland Empire Health Plan v. Superior Court</u>, 108 Cal. App. 4th 588, 593

21  (2003) ("a city has a mandatory duty to issue a certificate of occupancy once it has found

22  that a construction project has complied with all requirements").  "The critical point . . .

23  which defendants have failed to grasp, is that . . . the building official had already exercised

24  its discretion; even if the building official is immune for its discretionary act in determining

25  whether or not the certificate should be issued (i.e., that the building complies with the

26  relevant requirements), the building official had in fact – by its 'Final Inspection Okay' –

27  already actually approved [the] owner's building."  <u>Thompson v. City of Lake Elsinore</u>, 18

28  Cal. App. 4th at 58.  "Accordingly, the building official retained no further discretion to

1   withhold the certificate of occupancy."  Id.

2          Here, the Mayor, the San Diego Building Official, the City's own inspectors, and the

3   San Diego Municipal Auditor have all stated that Plaintiff met every requirement for

4   immediate use and occupancy of the Otay Mesa facility.  (See Tr. (Doc. No. 15) at 5:1-2;

5   Bonfiglio Decl. ¶¶ 12, 18-19, Ex. U; see also Audit Report.)  Defendants cannot point to

6   any provision of the Municipal Code that allows the City to conduct all required

7   inspections and approve all permits and occupancy, only to later decide not to issue the

8   formal certificate of occupancy.  Based on the SDMC as well as state law, the Court

9   concludes that Plaintiff has demonstrated a strong likelihood of success on its claim that

10  Defendants must issue the certificate(s).

11         The Court also concludes that Plaintiff has demonstrated a strong likelihood of

12  success on its procedural due process claim brought pursuant to 42 U.S.C. § 1983.  "A

13  property interest in a benefit protected by the due process clause results from a legitimate

14  claim of entitlement created and defined by an independent source, such as state or federal

15  law."  Parks v. Watson, 716 F.2d 646, 656 (9th Cir. 1983).  Here, Plaintiff argues that state

16  and local law providing that Defendants "shall" issue the certificate of occupancy creates a

17  protectable property interest, because when a governmental agency is given little to no

18  discretion regarding whether to grant a permit, the denial of that permit creates a

19  protectable right.  See id.  Accordingly, Plaintiff argues that Defendants violated Plaintiff's

20  right to procedural due process by depriving Plaintiff of that right without "notice and

21  opportunity for hearing appropriate to the nature of the case."  See Cleveland Bd. of Educ.

22  v. Loudermill, 470 U.S. 532, 542 (1985).  Based on the submissions of both sides and all

23  the evidence properly before the Court, the Court concludes that Plaintiff has demonstrated

24  a strong likelihood of success on this claim.  Plaintiff's evidence shows that Plaintiff

25  obtained all necessary building permits and approvals for a certificate of occupancy, that on

26  April 30, 2008, the certificate of occupancy was approved (see Bonfiglio Decl., Ex. U), but

27  that Defendants without notice to Plaintiff have refused to actually issue the certificate of

28  occupancy.  See Parks, 716 F.2d at 657 ("[o]nce the conditions are met the city lacks

discretionary powers").

In sum, the Court concludes that Plaintiff has demonstrated a strong likelihood of success on the merits of its claim that Defendants have a mandatory duty to issue the certificate of occupancy.

**2.      Plaintiff Faces Irreparable Harm In the Absence of Injunctive Relief**

The Court concludes that Plaintiff has demonstrated that it faces a significant threat of immediate and irreparable injury in the absence of interim injunctive relief.  See Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999).  First, Plaintiff has demonstrated a strong likelihood of success on its constitutional claims, see supra, a situation in which most courts do not require a further showing of irreparable injury.  See Elrod v. Burns, 427 U.S. 347, 373 (1976).  Additionally, Plaintiff has demonstrated that it has an urgent need to receive the certificate of occupancy and to continue occupying and utilizing the Otay Mesa facility.  In the absence of interim injunctive relief, Plaintiff faces the threat of being unable to fulfill an important training contract with the United States Navy.  (See Bonfiglio Decl. ¶ 31.)  Plaintiff's obligations under that contract have already commenced, and the evidence indicates that following the Court's order issuing a TRO, Plaintiff welcomed its first class of Navy sailors and began training pursuant to the contract.  Without a preliminary injunction, Plaintiff will be unable to continue that training.  Moreover, the Court concludes that in addition to the potential monetary harm and deprivation of its constitutional rights Plaintiff faces a threat of significant harm to its reputation if it cannot conduct the training according to its contract.  See United Healthcare Ins. Co. v. AdvancePCS, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury.").  Based on all the evidence properly before the Court, the Court concludes that Plaintiff meets its burden under the law to establish that, without injunctive relief, Plaintiff will suffer irreparable injury.

///

///

///

08cv926

### 3.      Balance of Hardships

Third, the Court concludes that the threatened injury to Plaintiff outweighs whatever damage a preliminary injunction might cause to Defendants.  See Regents of Univ. of Cal. v. ABC, Inc., 747 F.2d at 515.  The potential harm to Plaintiff if injunctive relief is denied is significant, while granting a preliminary injunction will result in little to no damage or hardship to Defendants.  The Court concludes that the balance of hardships tips sharply in Plaintiff's favor, so that even if Plaintiff's application demonstrated only "serious questions going to the merits," Plaintiff still would be entitled to a preliminary injunction under the Ninth Circuit's alternative standard for interim injunctive relief.  Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998); see Stuhlbarg Int'l. Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839-40 (9th Cir. 2001).

### 4.      Consideration of the Public Interest

Finally, the Court concludes that granting a preliminary injunction will not adversely affect the public interest.  Id.  To the contrary, given the nature of the intended use of the Otay Mesa facility and Plaintiff's training contract with the United States Navy, the Court concludes that the public interest weighs in favor of granting injunctive relief.

///

///

///

///

///

///

///

///

///

///

///

///

08cv926

1

### Conclusion

2      For the reasons discussed above, the Court issues a preliminary injunction keeping

3 in place the terms of the TRO that the Court granted on June 4, 2008.  On June 6, 2008,

4 Defendants provided notice that they complied with the TRO by sending to Plaintiff the

5 certificates of occupancy.  (See Doc. No. 20.)  Accordingly, Defendants are hereby

6 enjoined from refusing to allow Plaintiff to occupy and use immediately the property

7 located at 7685 Siempre Viva Road, Otay Mesa, consistent with the building permit

8 applications that the City already has granted.  Defendants also are enjoined from revoking

9 Plaintiff's certificate(s) of occupancy and/or subjecting Plaintiff's ministerial permit

10 applications to additional "discretionary" review, absent further order of the Court.  Finally,

11 the Court orders Defendants to promptly and properly process any currently pending

12 ministerial permits for the Otay Mesa property.

13      Under the circumstances of this case, the Court concludes that Plaintiff must give

14 security in the amount of $10,000.  See Fed. R. Civ. P. 65(c).

15 IT IS SO ORDERED.

16 DATED:  June 17, 2008

17

18      MARILYN L. HUFF, District Judge
        UNITED STATES DISTRICT COURT

19

20

21

22

23

24

25

26

27

28